UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **MISTY COTHERMAN THORNHILL, ET AL.** | **CIVIL ACTION NO. 15-01867** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **JACKSON PARISH HOSPITAL** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

Plaintiffs Misty Cotherman Thornhill, individually and as Administrator of the Estate of George Richard Cotherman, Sr.; George Richard Cotherman, Jr.; Jeffery Lee Cotherman; Jason Lynn Cotherman; Melinda Cotherman Taylor; and Christopher Delane Cotherman (collectively "Plaintiffs") brought this suit against Defendant Jackson Parish Hospital ("Jackson Parish") for alleged violations of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, *et seq*. ("EMTALA") based on the allegedly defective transfer of Cotherman from Jackson Parish to St. Francis Medical Center.[1]

Pending before the Court is Jackson Parish's Motion for Summary Judgment. [Doc. No. 6]. Because Jackson Parish's duty under EMTALA ended when it admitted Cotherman as an inpatient, the motion is GRANTED.

**I.    FACTS AND PROCEDURAL HISTORY**

Unless otherwise noted, the following facts are undisputed.

On June 15, 2013, Cotherman was transported by ambulance to the emergency department of Jackson Parish for medical treatment. Cotherman, a fifty-five-year-old smoker, complained that

---

[1] The Court refers to the decedent, George Richard Cotherman, Sr., as "Cotherman."

he had had shortness of breath for two or three weeks. [Doc. No. 6-4, p. 17]. Dr. Bryan Rosedale ("Rosedale") examined Cotherman and ordered monitoring, labs, diagnostic studies, and medications. *Id*. at 40-41, 44. Cotherman refused admission, transfer, and referral, and left the hospital against medical advice. *Id.* at 41, 52.

On June 16, 2013, Cotherman presented at Jackson Parish's emergency department via ambulance with shortness of breath and decreased level of consciousness. *Id*. at 9. Dr. Rosedale examined Cotherman and again ordered monitoring, labs, diagnostic studies, and medication. *Id*. at 8-9, 13. Cotherman's family members arrived around this time. Cotherman agreed to stay at the hospital and was admitted as an inpatient with a plan for IV fluids, IV antibiotics, IV steroids, Solu-Medrol, respiratory treatments, chest x-ray in the morning, supportive care, and reassessment. *Id.* at 18. Jackson Parish transferred Cotherman from the ER to the floor.

After Cotherman was admitted to the floor, additional family members arrived. Cotherman's family members requested that he be transferred to St. Francis Medical Center. The transfer was arranged. *Id.* at 16. Cotherman was intubated prior to transfer. *Id*. Plaintiffs claim that Cotherman experienced problems with his airflow which were corrected. [Doc. No. 1].Shortly after the alleged airflow problems were corrected, Plaintiffs assert that the ambulance arrived to transport Cotherman. [Doc. No. 1].Cotherman was placed on a portable ventilation system and transferred by Jackson Parish Ambulance Service to St. Francis Medical Center. [Doc. No. 6-4, p. 16].The Jackson Parish Ambulance Service records indicate that the Jackson Parish Ambulance Service personnel were given instructions to monitor Cotherman's cardiac, IV, oxygen, and vent status. [Doc. No. 6-5, p. 21]. Plaintiffs claim, however, that, according to the "Transfer and Medical Necessity Form" maintained by Jackson Parish, only cardiac monitoring was applicable to Cotherman. [Doc. No. 1].

During transit, Cotherman coded, went into asystole and became cyanotic. *Id.* Due to the complications, Cotherman was rerouted to the North Louisiana Medical Center ("NLMC") in Ruston, Louisiana. *Id*. Upon arrival, it was observed that Cotherman appeared blue and dusky; he had no rise or fall to his chest, and there was no sound of air movement. *Id.* Despite measures taken by NLMC, Cotherman never regained consciousness. *Id*. He died on June 24, 2013, the ninth day after his admission to NLMC. *Id*.

Plaintiffs brought this suit on July 15, 2015, claiming that Jackson Parish violated EMTALA by not providing an appropriate transfer from its hospital to St. Francis Medical Center. [Doc. No. 1].[2]

Specifically, Plaintiffs claim that the transfer to St. Francis Medical Center was not affected through qualified personnel or through satisfactory equipment in accordance with EMTALA. They note that a work order form shows that the Jackson Parish Ambulance Service ventilator was serviced on July 2, 2013–shortly after its use on Cotherman. The work order form reported "repaired/replaced cracked, broken, and/or worn out parts." [Doc. No. 18-1, p. 10].

Plaintiffs also question why Jackson Parish Ambulance Service did not remove Cotherman from an allegedly malfunctioning vent to provide manual treatment in the hopes of reviving him. According to Plaintiffs, "the actions of the doctors, nurses, respiratory therapists, and other healthcare agents of Jackson Parish Hospital, including the emergency medical technicians of [Jackson Parish Ambulance Service], fell below the required standards of care and violated the provisions of EMTALA..." [Doc. No. 1]. Finally, Plaintiffs question whether Jackson Parish should

---

[2]According to Jackson Parish, Plaintiffs have also filed suit against it in state court under the Louisiana Medical Malpractice Act. Plaintiffs have also filed a separate suit against Jackson Parish Ambulance Service in state court.

have probed deeper into the qualifications of Jackson Parish Ambulance Service.

On August 12, 2015, Jackson Parish filed this Motion for Summary Judgment, claiming that, according to a regulation issued by the agency responsible for administering the statute, a hospital's duty under EMTALA ends when the hospital, in good faith, admits an individual for inpatient care. [Doc. No. 6]. In the alternative, Jackson Parish asserts that the transfer was affected through qualified personnel and equipment under established precedent.

Consideration of this motion was stayed for multiple months to allow Plaintiffs to conduct discovery. On December 1, 2015, Plaintiffs filed a memorandum in opposition to the motion. [Doc. No. 18]. Plaintiffs claim, among other things, that material issues of genuine fact exist with respect to Jackson Parish's choice of Jackson Parish Ambulance Service to execute Cotherman's transfer. On December 11, 2015, Jackson Parish filed a reply. [Doc. No. 19]. The matter is briefed and ripe.

## II.  LAW AND ANALYSIS

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would

affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"Only disputes over facts that might affect the outcome of the suit under governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*.

    **B.**    **Jackson Parish's Liability under EMTALA**

        **1.**    **EMTALA Generally**

Congress enacted EMTALA in order to prevent patient dumping, which is "the practice of some hospital emergency rooms [of] turning away or transferring indigents to public hospitals without prior assessment or stabilization treatment." *See Harry v. Marchant*, 291 F.3d 767, 772 (11th Cir. 2002) (citing H.R. Rep. No. 99-241, pt. 3, at 5 (1986), *reprinted in* 1986 U.S.C.C.A.N. 726, 726-27); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039-41 (D.C. Cir. 1991); *Cleland*

*v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268-69 (6th Cir. 1990).

Importantly, EMTALA was not intended to become a federal malpractice statute. *See, e.g., Marshall on Behalf of Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136-37 (8th Cir. 1996) (en banc); *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 142 (4th Cir. 1996); *Correa v. Hosp. S. F.*, 69 F.3d 1184, 1192 (1st Cir. 1995); *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1255 (9th Cir. 1995); *Urban By and Through Urban v. King*, 43 F.3d 523, 525 (10th Cir. 1994); *Holcomb v. Monahan*, 30 F.3d 116, 117 & n.2 (11th Cir. 1994). Rather, it was enacted to give plaintiffs an entirely new action: a cause of action based on a failure to treat. *See Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999) (noting that EMTALA's legislative history shows it was intended to fill vacuum by imposing duty on hospitals to provide treatment to all); *Brooks v. Md. Gen. Hosp. Inc.*, 996 F.2d 708, 714-15 (4th Cir. 1993); *see also Root v. Liberty Emergency Physicians*, *Inc.*, 68 F.Supp.2d 1086, 1091 (W.D. Mo. 199), *aff'd* 209 F.3d 1068 (8th Cir. 2000) ("EMTALA has been described as a 'gap filler' for state malpractice law, giving patients who would otherwise have no claim in state court a forum to redress their injuries"); *Slabik v. Sorrentino*, 891 F.Supp. 235, 237 (E.D. Pa. 1995) *aff'd* 82 F.3d 406 (3d Cir. 1996) (citations omitted) (EMTALA "was designed to create a new cause of action for failure to screen and stabilize patients, not to federalize traditional state-based claims of negligence or malpractice").

"This intent to supplement, but not supplant, state tort law is evidenced in EMTALA's limited preemption provision." *Hardy*, 164 F.3d at 793 (citations omitted).The limited preemption provision provides "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this

6

section." 42 U.S.C. § 1395dd(f).

To accomplish its goals, EMTALA first mandates that for any individual "who comes to the emergency department" and requests treatment, the hospital must "provide for an appropriate medical screening examination...to determine whether or not an emergency medical condition exists." 42 U.S.C. § 1395dd(a). If an emergency medical condition exists, then, as a general rule, the hospital must stabilize the individual before discharging or transferring him. The term "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility..." 42 U.S.C. § 1395dd(e)(3)(A).

In some scenarios, however, the hospital may transfer the patient before stabilization. The exceptions apply when "the individual makes a written request for transfer to another hospital or 'a physician has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual...and the transfer is an appropriate transfer...'" *Guzman v. Mem'l. Hosp. Sys.*, 637 F.Supp.2d 464, 478-79 (S.D. Tex. 2009) (quoting 42 U.S.C. § 1395dd(c)(1), *aff'd*, 409 Fed. App'x 769 (5th Cir. 2011)).

An appropriate transfer is one which is effected "through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer..." 42 U.S.C. § 1395dd(c)(2)(C). The appropriate transfer provision does not impose an onerous duty on the transferring physician. He is not responsible for ascertaining all risks and benefits associated with the transfer. *See Burditt v. U.S. Dep't of Health and Human Servs.*, 934 F.2d 1362, 1372 (5th Cir. 1991). Rather, only conditions known to the

transferring physician bear on the question of whether the transfer was appropriate. *Id.*

### 2. CMS Regulations and Case Law Concerning EMTALA's Applicability to Inpatient Care

The question courts initially faced was when the hospital's duty under EMTALA ends. The Sixth Circuit in *Thorton v. Southwest Detroit Hosp.*, 895 F.2d 1131 (6th Cir. 1990), held that the stabilization duty under the statute extends until the emergency medical condition is stabilized, regardless of when that occurs:

> although emergency care often, and almost invariably begins, in an emergency room, emergency care does not always stop when a patient is wheeled from the emergency room into the main hospital. Hospitals may not circumvent the requirements of [EMTALA] merely by admitting an emergency room patient to the hospital, then immediately discharging that patient. Emergency care must be given until the patient's emergency medical condition is stabilized.

*Id*. at 1135.

In *Bryan v. Rectors & Visitors of the Univ. of Vir.*, 95 F.3d 349 (4th Cir. 1996), however, the Fourth Circuit reached a different conclusion, holding that after an undefined time period, a hospital's duty under EMTALA ends:

> The stabilization requirement is...defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency room treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake the treatment. It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

*Id*. at 352.

In 2002, the Ninth Circuit, relying in part on *Bryan*, took a median approach, holding that a hospital's duty under the statute ends when the hospital admits the patient for inpatient care so long

as the admittance is in good faith and not a subterfuge to escape liability under EMTALA. *See Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1169 (9th Cir. 2002). This interpretation of the statute gained acceptance with multiple courts outside the Ninth Circuit. *See, e.g., Morgan v. North MS Med. Ctr., Inc.* 403 F.Supp.2d 1115, 1129 (S.D. Ala. 2005); *Mazurkiewicz v. Doylestown Hosp.*, 305 F.Supp.2d 437, 447 (E.D. Pa. 2004).

In 2003, the Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") released regulations essentially codifying the *Bryant* Court's interpretation of the statute.[3] Under 42 C.F.R. § 489.24(a)(1)(ii), "[i]f the hospital admits the individual as an inpatient for further treatment, the hospital's obligation [to stabilize] ends." Additionally, 42 C.F.R. § 489.24(d)(2)(i) provides that "[i]f a hospital has screened an individual...and found that individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities...with respect to that individual."

The vast majority of courts that have considered a hospital's duty under EMTALA since CMS promulgated the regulations have given the regulations controlling weight, or have cited them in support of finding that a hospital's duty under EMTALA ends upon admitting a patient in good faith. *See, e.g, Leimbach v. Haw. Pac. Health,* 14-00246, 2015 WL 4488384 at *7 (D. Haw. July 22, 2015) (noting that EMTALA generally ceases to apply when patient admitted to the hospital); *Elkharwily v. Mayo Holding Co.*, 84 F.Supp.3d 917, 928 (D. Minn. 2015) (citing CMS rule for proposition that duty ends once hospital admits the individual as an inpatient); *Ceballos-Germosen*

---

[3]Congress has delegated authority to CMS to issue rules and regulations "interpreting and implementing Medicare-related statutes such as EMTALA." *Torretti v. Main Line Hosp. Inc.*, 580 F.3d 168, 174 (3rd Cir. 2009) (citations omitted).

Case 3:15-cv-01867-RGJ-KLH   Document 20   Filed 05/04/16   Page 10 of 14 PageID #: 230

*v. Doctor's Hosp. Ctr. Manati*, 62 F.Supp.3d 224, 232 (D.P.R. 2014); *Johnson v. Frederick Mem. Hosp., Inc.*, WDQ-12-2312, 2013 WL 2149762, at *5 (D. Mary. May 15, 2013) (citing CMS regulation to find hospital's duty ends once hospital, in good faith, admits patient to stabilize condition); *James v. Jefferson Reg.*, 12-267, 2012 WL 1684570 at *3 (E.D. Mo. May 15, 2012); *Lopez v. Contra Costa Reg. Med. Ctr.*, 903 F.Supp. 2d 835, 842 (N.D. Ca. 2012) ("[T]he regulations and case law establish that a hospital's obligations under EMTALA are satisfied by admitting the patient in good faith..."); *Vazquez-Rivera v. Hosp. Episcopal San Lucas, Inc.*, 620 F.Supp.2d 264, 270 (D.P.R. 2009); *Martinez v. Porta*, 598 F.Supp.2d 807, 815 (N.D. Tex. 2009); *Benitez-Rodriguez v. Hosp. Pavio Hato Rey Inc.*, 588 F.Supp.2d 210, 214 (D.P.R. 2008); *Estate of Haight v. Robertson*, 03-885, 2008 WL 906013, at *3 (N.D. Ind. Mar. 31, 2008) (citing CMS regulation for proposition that hospital's duty under statute ends upon good-faith admittance); *Anderson v. Kindred Hosp.*, 05-294, 2008 WL 794275 at *2-4 (E.D. Tenn. Mar. 24, 2008) (finding regulation entitled to *Chevron* deference)*; Prickett v. Hot Spring Ctny. Med. Ctr.*, 07-6050, 2007 WL 29268862 at *3 (W.D. Ark. Oct. 5, 2007); *Morgan v. North Miss. Med. Ctr., Inc.*, 458 F.Supp. 2d 1341, 1350 (S.D. Ala. 2006).

In 2009, however, the Sixth Circuit rendered *Moses v. Providence Hosp. and Med. Cent., Inc.*, 561 F.3d 573 (6th Cir. 2009). There, the Sixth Circuit refused to afford 42 C.F.R. § 489.24(d)(2)(i) any type of deference, finding it "contrary" to the plain text of the statute:

> The CMS rule appears contrary to EMTALA's plain language, which requires a hospital to "provide...for such further medical examination and such treatment as may be required to stabilize the condition." Although "treatment" is undefined in the statute, it is nevertheless unambiguous, because it is unreasonable to believe that "treatment as may be required to stabilize" could mean simply admitting the patient and nothing further...

*Id*. at 583.


According to the *Moses* Court, the duty is to stabilize the emergency condition. This duty can extend to inpatient care. However, the Sixth Circuit appears to stand alone in that interpretation of the statute.

In the instant case, there is no dispute that Jackson Parish admitted Cotherman for inpatient care, nor is there any indication that it took this action in bad faith in order to escape liability under EMTALA.[4] Thus, this case turns upon whether, contrary to the CMS regulations and precedent from multiple courts, Jackson Parish continued to have a duty under the statute after admitting Cotherman. Plaintiffs ask the Court to side with the *Moses* Court and refuse to accord the CMS regulations any kind of deference. Jackson Parish asks the Court to give CMS' interpretation of the statute *Chevron* deference, thereby finding that the hospital satisfied its obligations under EMTALA when it admitted Cotherman for inpatient care. The Court agrees with Jackson Parish.

### 3. CMS' Interpretation of EMTALA is Entitled to *Chevron* Deference

Under the *Chevron* paradigm, unless Congress has spoken to the precise question at issue, courts are to defer to an agency's reasonable interpretation of a statute it administers. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Whether an agency's interpretation of a statute is entitled to *Chevron* deference requires the Court to undertake an analysis consisting of two steps. Under step one, the Court must discern whether Congress has spoken to the precise issue in question. When "'the statute is clear and unambiguous, that is the end of the matter; for [this] court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 292 (1988) (quoting *Bd. Of Governors of*

---

[4]Indeed, it appears that Jackson Parish attempted to admit Cotherman on June 15, 2013, but he left the hospital against medical advice. Also, Jackson Parish only transferred Cotherman on June 16, 2013, because his family members requested that action.

*the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368 (1986)); *Chevron*, 467 U.S. at 842-43. Courts should use "'traditional tools of statutory interpretation–text, structure, purpose, and legislative history,'" to discern whether Congress has spoken to the precise question at issue. *See Prime Time Intern. Co. v. Vilsack*, 930 F.Supp.2d 240, 248 (D.C.C. 2013) (quoting *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)).

Assuming Congress has not answered the precise question at issue, the Court must proceed to step two of *Chevron* and assess whether the agency's interpretation of the statute is a permissible one. *See Shays v. F.E.C.*, 337 F.Supp.2d 28, 52 (D.D.C. 2004) (citing *Chevron*, 467 U.S. at 483). This inquiry is highly deferential. *See Garcia-Carias v. Holder*, 697 F.3d 257, 271 (5th Cir. 2012) (citing *Chevron*, 467 U.S. at 844).

Turning to the first step of the *Chevron* inquiry, the Court finds that Congress has not directly spoken to whether EMTALA applies to individuals admitted to the hospital in good faith. The *Moses* Court felt that EMTALA's language indicates that the duty is to stabilize the emergency medical condition–a duty which is not satisfied by simply admitting the individual. However, as the Ninth Circuit and Fourth Circuit have noted, the term "to stabilize" is defined *only in relation to a potential transfer*, undermining the notion that EMTALA is at all concerned with long-term patient care. *See Bryant*, 289 F.3d at 1167 (citing *Bryan*, 95 F.3d 352). Indeed, the entire act centers on *emergency care*. Thus, the Court finds that Congress has not directly spoken to EMTALA's applicability to inpatient care.

That conclusion leads to the next prong of the *Chevron* inquiry: is the agency's interpretation a permissible interpretation of the statute? That question must be answered in the affirmative. First, EMTALA was clearly enacted to address a "'distinct and rather narrow problem–the 'dumping' of

uninsured, underinsured, or indigent patients by hospitals who did not want to treat them." *See Heimlicher v. Steele*, 615 F.Supp.2d 884, 900-01 (N.D. Iowa) (quoting *Summers*, 91 F.3d at 1136). Once a hospital admits a patient in good faith, that concern has been addressed and state medical malpractice law supplies the relief. Moreover, the statute's language, as well as its Legislative history, clearly evince a desire to avoid preempting state law. By finding that the duty under EMTALA extends until stabilization, no matter when that may be, the Sixth Circuit's interpretation arguably offends the statute's hesitation to avoid preemption. *See Dollard v. Allen*, F.Supp.2d 1127, 1135 (D. Wyo. 2003) (finding that an interpretation of EMTALA which extends the hospital's duty to individuals admitted to the hospital would render the preemption provision superfluous); *see also Bryant*, 289 F.3d at 1169. ("If EMTALA liability extended to inpatient care, EMTALA would be convert[ed]...into a medical malpractice statute, something it was never intended to be"). The CMS' interpretation addresses that concern by precluding EMTALA's applicability when the hospital admits a patient in good faith in order to stabilize the emergency medical condition. Thus, the Court concludes that CMS' interpretation of EMTALA is permissible. This conclusion squares with the result reached by the majority of courts that have considered EMTALA's applicability to inpatient care.

Because Jackson Parish admitted Cotherman for inpatient treatment, and because there is no indication it took this action in bad faith, Jackson Parish satisfied its duty to Plaintiffs under EMTALA. Accordingly, Jackson Parish's Motion for Summary Judgment is GRANTED, and Plaintiffs' EMTALA claim is DISMISSED WITH PREJUDICE.

### III. CONCLUSION

For the foregoing reasons, Jackson Parish's Motion for Summary Judgment is GRANTED,

and Plaintiffs' claim is DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 4th day of May, 2016.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE